UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

CLAUDE MELVIN WELCH )
)
V. ) NO. 2:11-CV-31
)
MICHAEL J. ASTRUE, )
Commissioner of Social Security )

## REPORT AND RECOMMENDATION

The matter is before the United States Magistrate Judge, under the standing orders of the Court and 28 U.S.C. § 636 for a report and recommendation following the denial of the plaintiff's applications for Disability Insurance Benefits and Supplemental Security Income under the Social Security Act. Both the plaintiff and the defendant Commissioner have filed dispositive Motions [Docs. 12 and 14].

The sole function of this Court in making this review is to determine whether the findings of the Secretary are supported by substantial evidence in the record. *McCormick v. Secretary of Health & Human Services*, 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Comm.*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Secretary's decision must stand if supported by substantial evidence. *Listenbee v. Secretary of Health and Human*

*Services*, 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

Plaintiff was 40 years old at the time of his disability onset date of June 30, 2007. He has a limited education. He has a fifth grade or "limited" education. His past relevant work experience was as a painters helper, which was medium, unskilled work. Plaintiff asserts, and is believable in this respect, that he has no health insurance. (Tr. 201).

Plaintiff asserts that he has severe back and shoulder problems accompanied by severe pain, mild mental retardation, and depression. Plaintiff did not initially identify any mental impairment as a basis for his claimed disability (Tr. 170). Plaintiff asserted that he worked until 2007, and that he often worked for cash with unreported earnings to the Social Security Administration (Tr. 171). His earnings report from the Administration shows that he earned over nine thousand dollars in 1999, and over eight thousand in 2001. (Tr. 164). He has had a lifelong history of alcohol abuse, reporting himself that he became alcohol-dependant at Age 5, and that his longest period of sobriety was while imprisoned. (Tr. 294).

The medical history is somewhat meager, which plaintiff states is due to his lack of health insurance. The first record is from the Greenville Hospital in Greenville, South Carolina dated June 22, 1986. Dr. Cobb Alexander, M.D., stated that the plaintiff hurt himself when he fell onto some machinery in the textile mill in which he worked. He complained of low back pain radiating into both legs. The physical exam showed a loss of lumbar lordosis with mild paraspinous muscle spasm. The impression was "low back pain,

2

etiology undetermined. Possible central herniated nucleus pulposus." It stated the plaintiff was to be admitted for a myelogram and CT scan. (Tr. 353). The Court is unable to locate records of that procedure from 1986.

12 years later, in 1998, plaintiff injured his back while working as a painter in Greenville, South Carolina (Tr. 369). An MRI was performed on December 15, 1998, which showed a right L4/5 level herniated nucleus pulposus ("HNP") with right L4 nerve root encroachment and right sciatica. He was deemed a good candidate for surgical intervention. (Tr. 339). On January 21, 1999, Dr. H.S. Reid and Dr. Kirk Hensarling performed a right L4-5 extraforaminal disection, the "degenerated disk material" was removed, freeing the nerve root. (Tr. 343-44). There is a one page record of an obviously longer report in which Dr. Hensarling opines that plaintiff has a 5% impairment to the back/lumbar area following the procedure. (Tr. 350). It appears that the plaintiff's counsel in this proceeding at that time provided the records regarding his back surgery to the ALJ on "12/1/2009". (Tr. 340).

He was apparently next given medical treatment at the Takoma Hospital Emergency Room when he presented with a head injury. An MRI was unremarkable. The laceration was stapled and plaintiff left before he was released to do so. (Tr. 297-304).

The medical record regarding the plaintiff's physical problems commences again March 2, 2008, with a visit to the Holston Valley Medical Center Emergency Room ["ER"] complaining of injuries sustained in a fall which took place on February 13, 2008.[1] The examiner noted the plaintiff had a positive straight leg raising test. He was given Lortab and

---

[1] The majority of these ER records are handwritten in "medical shorthand" and are very difficult to accurately read.

Robaxin and released without x-rays or other intensive examination. (Tr. 239). He returned to the ER on March 9, 2008 with similar complaints. An x-ray of the lumbar spine was taken which showed no fracture or dislocation and mild degenerative changes. (Tr. 297-98). He returned to the ER on March 17, 2008, and the physical exam showed low back pain on flexion. He was again given Lortab. (Tr. 236). On April 18, 2008, he returned once again to the ER with further complaints. The examination revealed "vertebral point tenderness." The impression was chronic low back pain. He was again given Lortab. (Tr. 235-36).

On April 23, 2008, plaintiff again visited the ER complaining of dull pain radiating into his leg. It was noted he smelled of alcohol. He was again prescribed Lortab. On April 26th, he again went to the ER. Physical exam showed a decreased range of motion in the lower back and muscle spasm was observed. He again smelled of alcohol. (Tr. 230-31). On May 2, 2008, he again went to the ER complaining of radiating lower back pain. The exam revealed a decreased ROM and vertebral point tenderness. He was given Lortab, but advised that he would have to see a primary care provider ["PCP"] for future narcotic pain medication. However, the ER apparently did not enforce this restriction. (Tr. 228-29). On May 12th, he returned with the same complaints and was again given Lortab. (Tr. 226-27).

On May 18th, he returned to the ER again complaining of right shoulder pain. The physical exam revealed muscle spasm in the area of the right shoulder and neck. He was given Darvocet and Flexeril. (Tr. 224-25). He returned again on June 7th complaining of neck and right shoulder pain of moderate severity. He smelled of ethanol. He told the ER staff "he doesn't want muscle relaxers, he wants MRI of neck and Lortab." The impression was "neck pain." (Tr. 222-23). He returned again on July 12th, complaining of right shoulder

4

pain. Full ROM of the shoulder was noted. He was diagnosed with chronic right shoulder pain and was given Lortab. (Tr. 220-21).

On December 11, 2008, a limited consultative examination was performed by Dr. Marianne Filka at the request of the Commissioner. Plaintiff advised that he had "cracked his tail bone" and had a pinched nerve in his neck that caused shoulder pain. He told her he did not drink except for an occasional beer. Dr. Filka stated he was a good historian and appeared to have "average intellectual functioning." Plaintiff had a full ROM in both shoulders, a normal gait, and the ability to toe stand. He had forward flexion in the lower back to 90 degrees with normal lateral bending and extension. She opined he had chronic lumbar and right shoulder pain, bilateral carpal tunnel syndrome, different kinds of headaches, and "anxiety with panic attacks and depression based on review of systems." She "hoped" that information was useful in determining whether plaintiff "deserves a full disability exam." (Tr. 240-43). Such a "full disability exam" was never performed.

In January 2009, a non-examining State Agency physician opined the plaintiff could physically perform a full range of medium work, being limited to that extent by "partially credible" complaints of pain. (Tr. 250). Another State Agency physician read his opinion and agreed with him. (Tr. 257).

Dr. Theron Blickenstaff was called by the ALJ as a "medical expert" at the hearing held on October 28, 2009. Dr. Blickenstaff was asked by the ALJ if the plaintiff had a severe impairment and if he did, what his limitations were. The only records he stated he was aware of was the x-ray of the lower back in March, 2008; Dr. Filka's limited exam; and the CT of the head from Takoma Hospital in October 2002. Based on these, he stated "I don't see a

5

clear, clear limitation from this record that there needs to be physical limitations." (Tr. 51). When cross examined by the plaintiff's counsel regarding whether any other "exam or anything" was needed "that would clarify anything," Dr. Blickenstaff replied that there had been "complaints about the right shoulder," and that a "plain x-ray would perhaps help clarify that," and that "a full consultative examination would, should uncover anything else that might be present." When asked if the "mild degenerative changes" mentioned on the March, 2008 x-ray of the lower back could cause some degree of pain, Dr. Blickenstaff answered that "there's an extremely poor correlation between appearance on these studies and symptoms, so it would not be surprising for somebody with these findings to have no symptoms at all, and might have severe symptoms." [*sic*].

The evidence regarding the plaintiff's alleged mental impairments were not documented in the record until a visit to Lakeshore Mental Health Center in February, 2009, for possible suicidal ideation (Tr. 253-57). This record is, for the most part, also challenging to decipher. Plaintiff was noted to have mild tremors. (Tr. 253). Plaintiff reported he had not had alcohol for 5 months until 2 days before when he drank a fifth of liquor. He also admitted to having used other drugs, such as cocaine. (Tr. 254). He was reported has being anxious, having normal motor activity and speech, an intact memory, and average intellectual functioning. His mood was appropriate, his insight fair and his judgment was poor. His diagnoses were depression, polysubstance dependency, and chronic pain with a GAF of 50. (Tr. 255). Plaintiff was not admitted because he did no meet the criteria for suicidal ideation. Plaintiff signed an "agreement" stating that he was not suicidal and would keep his counseling appointments. (Tr. 256).

The next portion of the record dealing with the plaintiff's mental situation is the psychiatric review technique form and mental assessment prepared by Dr. George T. Davis, a State Agency psychologist, on March 30, 2009. Apparently, the only record he had to examine was the information from Lakeshore Mental Health Center discussed above. Dr. Davis opined that the plaintiff had a "moderate" amount of difficulties in maintaining concentration, persistence or pace (Tr. 268). In his functional capacity assessment, Dr. Davis stated that the plaintiff could understand and remember simple, detailed and complex tasks. He opined plaintiff could concentrate and attend to those tasks, despite some difficulty. He opined that the plaintiff could interact with coworkers, supervisors and the general public without significant limitations. He opined plaintiff could adapt to work-like settings and changes as needed. (Tr. 274).

There is a one page form regarding plaintiff from Holston Counseling Services dated March 25, 2009, provided to the ALJ on July 6, 2009. It states plaintiff had a mood disorder, alcohol dependence, and major depression. He had a GAF of 50. (Tr. 307).

Plaintiff had a psychiatric evaluation on June 23, 2009, at Frontier Health. He stated that he had applied for Social Security disability and had been depressed for quite a few years. He stated he had a history of alcohol dependency going back to age 5. He said he had not drank since June 10, 2009. He said he had "previously received inpatient A&D treatment at CCS in 2006. He also reports inpatient A&D treatment while at Woodridge and Lakeshore." He reported the visit to Lakeshore in February, 2009, described above, saying he had been "binge drinking due to his depression." Plaintiff also related he had received outpatient treatment for depression in South Carolina. He was noted to appear to have

7

average intelligence based upon his vocabulary and general fund of knowledge. He was diagnosed with severe, recurrent depression; alcohol dependence, chronic pain and financial difficulties. His GAF was 55. He was prescribed medication. (Tr. 294-96).

He returned to Frontier Health on August 24, 2009 for "pharmacologic management." He stated he missed his last appointment due to being incarcerated. He stated he could not tolerate the medicine he had been prescribed by Frontier earlier. He requested to be placed back on Zoloft and was prescribed hydroxyzine to target his anxiety until the Zoloft built up in his system. He again stated he had not had alcohol since June 10th of that year. He was to continue group therapy and to avoid alcohol. He was to return in two months. (Tr. 336-37).

On August 13, 2009, he was evaluated at the request of the Commissioner by Beth Ballard, a senior psychological examiner. She conducted a clinical interview and several psychological tests, including an intelligence test and a Miller Forensic Assessment of Symptoms Test ("M-Fast test"). The latter is apparently designed to detect malingering and lack of effort on the part of the patient. Plaintiff volunteered that he had consumed a 12 pack of beer the day before, and he had an odor of alcohol. Ms. Ballard however found him to have appropriate speech and behavior and to appear "motivated to provide accurate information."

When asked why he was applying for disability, plaintiff reported that "in the last few years I have lost everything because my nerves are so bad. I have major and severe depression." (Tr. 316). He recounted a medical and psychological treatment history consistent with the description of those events in the record. He stated he was in special

8

education classes throughout his school career. (Tr. 317). Ms. Ballard noted that while "he exhibited a predominately bright affect with the congruent mood," she thought his "judgment and insight may be somewhat limited due to his low intellectual functioning." (Tr. 318). Testing revealed a Verbal IQ of 65, a Performance IQ of 62, and Full Scale IQ of 65, which falls withing the mild range of mental retardation. (Tr. 319). His score on the M-Fast was 11. Ms. Ballard noted that "although he scored slightly above significance on unusual hallucinations, his other scores were within normal range and do not indicate he was likely malingering as he completed this inventory. He did appear to be honest." (Tr. 320). The scores on the other tests likewise indicated to Ms. Ballard that he was not malingering. (Tr. 321).

Ms. Ballard diagnosed the plaintiff with Major Depressive Disorder, Anxiety Disorder, Alcohol Dependence, and Mild Mental Retardation. She noted his complain of back pain and right shoulder pain. She assessed his GAF at 50. (Tr. 321). Ms. Ballard also completed a mental assessment. She opined that the plaintiff had "moderate" limitations[2] in his ability to understand, remember and carry out complex instructions, and his ability to make judgments on complex work-related decisions. She also found he had "moderate" limitations in his ability to interact appropriately with supervisors, and in his ability to respond appropriately to unusual work situations and to changes in a routine work setting. In this regard, Ms. Ballard stated "Mr. Welch becomes anxious when he is around people and has difficulty following through with appropriate social/employment interactions. He tends

---

[2]The form used defined "moderate" as "there is more than a slight limitation in this area, but the individual is still able to function satisfactorily." (Tr. 322).

9

to become angry with people rather quickly, and then blows up at them. He misinterprets what they say to him due to his low intellectual funcioning,, and often takes things the wrong way, causing him to become angry. He does not like to be told what to do by others, therefore, will likely have difficulty following through with instructions from an employer." (Tr. 323).

Ms. Ballard also felt he had other capabilities affected by his impairment. She said "Mr. Welch has difficulty maintaining his home due to his lack of energy, motivation and understanding of the appropriate ways to keep up his home. He does not know how to pay bills, write checks, travel by himself, or mow the yard. He does, however, know how to cook and appears to enjoy doing so." She also stated "Mr. Welch does abuse alcohol, but this was not factored into the above responses. His alcohol abuse would likely impact his judgment and insight." (Tr. 323).

Ms. Ballard's findings are confusing to the Court. On the one hand, she says he can function at least satisfactorily in all areas, and yet states he "will likely have difficulty following through with instructions from an employer" because "he does not like being told what to do by others." The only logical way to interpret her choice of "moderate/satisfactory" is that she felt he might have some difficulty but could put aside his feelings and perform on a consistent basis. There is no other definition of the word "satisfactory" that the Court can divine that would apply.

Dr. Thomas Schacht, a psychologist, testified as a "medical expert" at the hearing. (Tr. 52-57). Dr. Schacht noted that "there are conflicts in the record with respect" to the plaintiff's intelligence. He noted that Dr. Filka (who was performing a limited physical

10

exam), Lakeshore and Holston Mental Health had "estimated average...intellectual functioning," in contrast to Ms. Ballard's testing which resulted in a full scale IQ of 65. He noted that Ms. Ballard found that "memory malingering did not suggest a poor effort," but then stated that "an artificially low score doesn't necessarily depend on effort..." because the plaintiff had admitted to drinking a 12 pack of beer the day before the testing and had smelled of alcohol when being interviewed by Ms. Ballard. Dr. Schacht concluded that "intoxication is an alternate hypothesis which would explain a lower score different from the remainder of the records." (Tr. 53-54). He stated that "the only other impairment that's really established by this record is alcohol dependence." He felt that there was "no indication" that reported depression was "separate from the alcohol dependence." (Tr. 54). The bulk of cross-examination by plaintiff's counsel resulted in Dr. Schacht criticizing some of Ms. Ballard's methods and statements, such as her interpretation of the M-Fast test, and in noting her assessment gave plaintiff at least a "satisfactory" rating of function in all areas.

Following up on the statement by Dr. Blickenstaff that an x-ray of the plaintiff's right shoulder might be useful in determining whether there was any objective basis for the plaintiff's complaints, the ALJ sent the plaintiff to Dr. Daniel Slonaker to have this done. Dr. Slonaker found that the "proximal humerus is intact bilaterally," and that the "joint space appears to be well maintained." He said there was "some mild arthritic changes of the acromioclavicular joint," and that "otherwise (the) shoulder appears to be intact." His impression was "mild arthritis of the acromioclavicular joint." (Tr. 375).

In his hearing decision, the ALJ begins by finding that the plaintiff "does not have any impairment(s) which significantly limits his physical or mental ability to do basic work

11

activity. Consequently, it must be found that the claimant does not have a severe impairment...," ending the sequential analysis at Step Two. (Tr. 20).

The ALJ then describes the evidence utilized to reach the conclusion that the plaintiff had no severe impairments. He mentions hospital records from Greenville, South Carolina from the 1986 fall at the textile mill. He mentions the MRI from 1998 which showed the herniated nucleus pulposus at L4-5, and the conservative treatment which followed. He mentions the discectomy, and states that there are no further treatment notes from the South Carolina physicians. He did not mention Dr. Hensarling's post-operative statement (Tr. 350) dated May 7, 1999, that the plaintiff had a 5% impairment to the back/lumbar area. (Tr. 22).

He then recounts the various visits in 2008 to the Holston Valley Medical Center emergency room. He does not mention the muscle spasms observed April 26th and May 18th of that year. He described the limited exam performed by Dr. Filka. He mentions the findings of the State Agency physicians limiting him to medium work. (Tr. 23). He then discusses Dr. Blickenstaff's testimony and the three pieces of evidence recounted by him from 2002 and 2008. He stated that Dr. Blickenstaff suggested "that a plain x-ray would clarify whether or not there should be any limitations..." from the plaintiff's complaints of right shoulder pain. The ALJ then states that, subsequent to the hearing, he obtained the x-ray recommended by Dr. Blickenstaff and states "this examination revealed only mild arthritis of the acromioclavicular joint." (Tr. 24).

The ALJ then stated he "rejects the findings of the State Agency physician and accepts Dr. Blickenstaff's opinion that the claimant does not experience a severe physical impairment imposing significant work-related limitations." (Tr. 24). He then discussed the mental

12

evidence. He noted the results of Ms. Ballard's interview and testing, emphasizing her finding that she found the plaintiff "satisfactory" in all areas of functioning. (Tr. 25-26). He then paraphrased Dr. Schacht's testimony. (Tr. 26).

The ALJ stated that the plaintiff's "statements concerning the intensity, persistence and limiting effects..." of his symptoms "are not credible to the extent alleged and are not supported by the medical evidence of record." He found that "absent alcohol abuse, ... the claimant experiences mild limitations in the activities of daily living, in maintaining social functioning and in maintaining concentration, persistence and pace..." (Tr. 28).

The ALJ also found that "even if the claimant had the residual functional capacity for medium work, as assessed by the State Agency physicians, he would nonetheless be found 'not disabled' as he would be able to return to his past relevant work. Moreover, even (if) the claimant did function within the mental retardation range of intellectual functioning, he would nonetheless be found not disabled as he could still return to his past relevant work." (Tr. 28). Accordingly, he was found to be not disabled. (Tr. 29).

Plaintiff first asserts that the ALJ erred in finding no severe impairment, and argues that he has both severe physical and mental impairments. A "Step Two" finding that a claimant has no severe impairments, at least at the ALJ level of adjudication, is a rare occurrence. The Sixth Circuit, from time immemorial, has held that "the step two severity regulation...has been construed as a *de minimis* hurdle in the disability determination process...Under the prevailing *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). *citations*

13

*omitted.* The *de minimis* standard exists to allow "the threshold dismissal of claims obviously lacking medical merit." *Id.* "The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out 'totally groundless claims.'" *Griffeth v. Commissioner of Social Security*, 217 F. App'x 425, 428 (6th Cir. 2007), quoting *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir. 1985).

From a physical standpoint, the evidence regarding the plaintiff's back surgery in 1999 was submitted subsequent to the hearing, but before the ALJ rendered his hearing decision. Those records were not before Dr. Filka, they were not before the State Agency physicians, and they were not before Dr. Blickenstaff. Those records show that the plaintiff underwent serious back surgery, and that his treating physician opined that he had a 5% impairment to his lower back.[3] This is a different situation from that presented when evidence is produced to the Appeals Council *after* the ALJ has rendered his decision. In that circumstance, the plaintiff must show that the evidence is material and that good cause existed for it not having been presented to the ALJ. Here, the evidence regarding the plaintiff's treatment in South Carolina was apparently filed on December 1, 2009, more than two months before the hearing decision was rendered on February 8, 2010. No physician examined the plaintiff to opine as to residual functional capacity. No physician who evaluated the plaintiff's medical history saw these records, or the post-hearing x-ray for that matter.

Likewise, the various reports of observed muscle spasms indicate the presence of a

---

[3] The Court completely understands that the issue of "disability" is reserved to the Commissioner. However, this is strong evidence that the physician expected a degree of impairment after the back surgery, and is thus evidence of the existence of a severe impairment.

14

severe impairment. These cannot be faked, and are not believed to be related to alcohol abuse. Also, the medical record is full of the plaintiff relating his past medical history, including the surgery, with a more than fair degree of accuracy. In the opinion of the Court, Dr. Blickenstaff was correct when he stated on cross-examination that after the shoulder x-ray was taken, "a full consultative examination would, should uncover anything else that might be present." (Tr. 51). The fact that no medical source has had access to the records of the back surgery or has performed a physical exam to opine as to the plaintiff's vocational capabilities destroys any substantial justification for the ALJ's decision. In the opinion of the Court, the *de minimis* hurdle has been met, and the ALJ erred in not finding a severe physical impairment.

The mental picture is not as clear cut, mainly due to the plaintiff's alcohol abuse. Dr. Schacht, unlike Dr. Blickenstaff on the physical side, had the entire record regarding the plaintiff's mental impairment before him. A serious question is presented by Ms. Ballard's IQ findings. However, at this juncture and with the persistent record of alcohol abuse, including the 12 pack consumed the day before the testing, the ALJ had evidence to conclude that there was no mental impairment apart from alcoholism. On remand, the plaintiff will be allowed the opportunity to present further objective evidence, such as school records, etc., regarding his asserted mental impairment, which may necessitate further evaluation of this by the ALJ.

It is respectfully recommended that the plaintiff's Motion for Judgment on the Pleadings [Doc. 12] be GRANTED, and that the case be remanded for further evaluation of the plaintiff's alleged physical impairments, including a consultative examination. It is

15

further recommended that the Commissioner's Motion for Summary Judgment [Doc. 14] be DENIED.[4]

Respectfully submitted:

  s/ Dennis H. Inman
United States Magistrate Judge

---

[4]Any objections to this report and recommendation must be filed within fourteen (l4) days of its service or further appeal will be waived. 28 U.S.C. 636(b)(1).